UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
        :
UNITED STATES OF AMERICA        :
        :
    -v-        :
        :      20 Cr. 609 (JPC)
DANIEL SPIEGELMAN,        :      10 Cr. 339 (JPC)
    a/k/a "Daniel Kikabidze,"        :
        :      <u>ORDER</u>
        Defendant.        :
        :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Defendant Daniel Spiegelman, a/k/a "Daniel Kikabidze," ("Kikabidze") is presently serving concurrent five-year and three-year terms of supervised release, the first of which was imposed in No. 10 Cr. 339, following his plea of guilty to three counts of bank fraud, identity theft, and possession of false identification documents, *see* Judgment in a Criminal Case ("2010 Judgment") at 1, 3, *United States v. Spiegelman*, No. 10 Cr. 339 (JPC) (S.D.N.Y. Dec. 10, 2010), Dkt. 13, and the second of which was imposed in No. 20 Cr. 609, following his plea of guilty to one count of escape from custody, *see* Dkt. 18[1] ("2021 Judgment") at 1, 3.  As a condition of each term of supervised release, Mr. Kikabidze must remain within the judicial district of his residence—in this case, the Southern District of New York—absent permission from the Court or from his probation officer to leave it.  *See* 2010 Judgment at 3; 2021 Judgment at 4.  On October 24, 2022, Mr. Kikabidze requested permission from the Probation Office to travel to Russia for the purposes of renouncing his American citizenship.  Dkt. 31 ("Motion") at 1.  After his probation officer denied him permission to travel to Russia, Mr. Kikabidze sought it from this Court.  *Id.*  For the following reasons, Mr. Kikabidze is denied permission to travel to Russia.

---

[1] Unless otherwise noted, all citations are to the docket at No. 20 Cr. 609.

Mr. Kikabidze's primary argument for why this Court should permit his travel appears to flow as follows: he possesses a statutory right to relinquish his citizenship pursuant to 8 U.S.C. § 1481, *see* Motion at 2-3, he can exercise that right only outside the territory of the United States, *see id.*, and no authority permits this Court to prevent him from traveling outside the United States to renounce his citizenship, Dkt. 49 ("Supp. Reply") at 2 ("In its supplemental brief, the Government fails to demonstrate the mechanism by which any one of these sources of authority may lawfully restrict the relinquishment of citizenship during SR."). But even if Mr. Kikabidze is correct that federal law grants him the right to relinquish his United States citizenship under certain circumstances, *see* 8 U.S.C. § 1481,[2] and that departing the United States is necessary for him to perform that renunciation,[3] the Court cannot accept his third contention—namely, that no authority

---

[2] In fact, it is not clear to the Court that 8 U.S.C. § 1481 grants citizens a legally enforceable *right* to renounce their citizenship. The statutory text merely provides that "[a] person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing United States nationality." 8 U.S.C. § 1481(a). Certainly, this provision establishes the federal government's authority to strip an individual of citizenship following the performance of any of the seven listed predicate acts. And the mandatory language of the provision—an individual "shall lose"—indicates that the government lacks discretion to decline to strip an individual's citizenship following the performance of a predicate act. However, it common for federal statutes to oblige federal officials to act without granting individuals affected by those acts a positive right to compel the obligatory official action. *See, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688 (1979) ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."). Thus, should the government decline to deprive an individual of citizenship following the performance of a predicate act listed in 8 U.S.C. § 1481, it is at least unclear whether that section would grant the individual a legally enforceable right to compel the federal government to do so.

[3] Title 8, United States Code, Section 1481 contemplates two methods by which a citizen may renounce citizenship while present within the United States. *See* 8 U.S.C. § 1481(a)(6)-(7). The Government concedes that neither appears applicable in this case, *see* Dkt. 48 at 2 n.2, and Mr. Kikabidze argues that "the domestic renunciation provision §1481(a)(6) is inoperative. By elimination of available choices, the remaining venue is the foreign renunciation provision." Supp. Reply at 1. Nonetheless, while section 1481(a)(6) requires the United States to be "in a state of war and the Attorney General . . . [to] approve such renunciation as not contrary to the interests of national defense," section 1481(a)(7) imposes no such conditions that are beyond Mr. Kikabidze's control, as it authorizes the loss of citizenship for:

permits the Court to restrict Mr. Kikabidze from traveling internationally for the purpose of renouncing his citizenship. As mentioned, each term of supervised release to which Mr. Kikabidze was sentenced has a condition that prohibits him from departing the Southern District of New York absent permission from his probation officer or from the Court. 2010 Judgment at 3; 2021 Judgment at 4. This condition does not oblige the Court or the Probation Office to grant permission if it is sought; rather, under this condition the Court may grant or deny permission, in its discretion. *See, e.g.*, Order, *United States v. Bravo*, No. 18 Cr. 283 (GHW) (S.D.N.Y. July 30, 2021), Dkt. 59 (denying permission to travel abroad). Thus, the judgments of conviction under which Mr. Kikabidze was sentenced authorize the Court to deny him permission to travel abroad.

Some language Mr. Kikabidze employs in his filings suggests a belief that, because in practice his statutory right to relinquish his citizenship can be exercised effectively only through international travel, the statute itself grants him some legal entitlement to engage in international travel, which the Court should enforce by granting his request:

> Foreign travel in the present context is a legally protected interest of a U.S. citizen and such action is explicitly called for by the statute. Without it, exercising the statutory rights would be impossible.
>
> <u>On the foregoing grounds the Court is respectfully asked to fulfill its intended function and enforce the statutory provisions of INA 349(a)(5) / 8 USC 1481(a)(5) according to its terms</u> . . . .

---

> committing any act of treason against, or attempting by force to overthrow, or bearing arms against, the United States, violating or conspiring to violate any of the provisions of section 2383 of title 18, or willfully performing any act in violation of section 2385 of title 18, or violating section 2384 of title 18 by engaging in a conspiracy to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, if and when [the citizen] is convicted thereof by a court martial or by a court of competent jurisdiction.

8 U.S.C. § 1481(a)(7). Thus, strictly speaking, it does not appear, as Mr. Kikabidze claims, that "[w]ithout [foreign travel], exercising the statutory right [to renounce one's citizenship] would be *impossible*." Dkt. 34 ("Reply") at 3 (emphasis added). Being convicted of treason, however, would be unlikely to secure in a timely manner Mr. Kikabidze's ultimate goal—namely, to depart the United States and to reside in Russia—and, so the record is clear, the Court strongly discourages Mr. Kikabidze from pursuing that method of renouncing his citizenship.

3

Reply at 3. The Court disagrees. By its terms, 8 U.S.C. § 1481(a) merely provides that an individual shall lose his or her United States nationality if he or she performs certain predicate acts voluntarily with the intention of relinquishing United States nationality. 8 U.S.C. § 1481(a). Thus, the statute enacts only the legal rule that those who perform those predicate acts lose their citizenship. Even were this provision to vest individuals with a legal right to the loss of citizenship upon performance of a predicate act, which is not at all clear, *see supra* note 2, it is a separate question whether individuals would thereby possess a legal right (or some other type of "legally protected interest") to perform the specified predicate acts. Mr. Kikabidze has given no argument for why the mere existence of a procedure that individuals may employ to relinquish their citizenship would preclude measures to advance legitimate governmental aims—such as the condition of supervised release at issue in this case—that incidentally restrict the use of that procedure. And the nature of the predicate acts required to relinquish citizenship makes it particularly implausible to infer that the right to relinquish citizenship confers a right (or other "legally protected interest") to engage in the specified predicate acts. Individuals can relinquish their citizenship, for example, by joining the armed forces of a foreign nation engaged in hostilities with the United States, 8 U.S.C. § 1481(a)(3), or by committing treason against the United States, *id.* § 1481(a)(7), but it hardly follows that individuals have a right (or other "legally protected interest") to join the armed forces of hostile foreign states or to commit treason. Thus, the Court concludes that Mr. Kikabidze has no legal entitlement to engage in any foreign travel that might be necessary to relinquish his citizenship.

Instead, then, the Court must decide his request using the principles that courts ordinarily employ when supervisees request to engage in foreign travel. In general, federal law authorizes courts to impose any condition of supervised release that both "is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D) [and] involves no greater

4

deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)."[4]  18 U.S.C. § 3583(d)(1)-(2).  Those four factors, respectively, are "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), and "the need for the sentence imposed . . . (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," *id.* § 3553(a)(2).  Because the condition of supervised release prohibiting travel absent permission must not restrict supervisees' liberty more than is reasonably necessary to secure the three cited purposes of supervised release, individual requests for permission to travel may not be denied unless the denial is necessary to achieve at least one of those purposes.  *Cf., e.g.*, *United States v. Friedberg*, 78 F.3d 94, 96-97 (2d Cir. 1996) (employing the standards used to review conditions of probation generally when reviewing requests for permission to travel pursuant to a condition of probation).

In this case, the Court denies Mr. Kikabidze's request because that denial is necessary to achieve the second cited purpose of supervised release—namely, "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Continuing Mr. Kikabidze's present supervised release with him remaining in the United States protects the public in at least two respects from further crimes that he might commit:  first, the Probation Office's continued monitoring of his activities may uncover and thereby prevent any criminal acts that he might plan or otherwise be inclined to execute, and second, the threat that supervised release might be revoked should he violate its conditions may deter him from further criminal acts or even from conduct that, while perhaps not itself criminal, might later lead to criminal activity.  Were Mr. Kikabidze

---

[4] A third requirement, pertaining to policy statements issued by the United States Sentencing Commission, is not relevant here.  18 U.S.C. § 3583(d)(3).

5

to travel to Russia, relinquish his United States citizenship, and begin to live in Russia, neither mechanism for preventing further crimes would continue to be effective: the Probation Office cannot meaningfully monitor Mr. Kikabidze's activity in Russia, and this Court would have no effective method of ordering his arrest, revocation of supervised release, and return to custody were he to engage in further crimes while in Russia.

To be sure, while supervised release would no longer be capable of reducing Mr. Kikabidze's likelihood of engaging in further criminal activity were he to depart the United States, relinquish his United States citizenship, and subsequently remain in Russia, a relocation to Russia might itself affect the likelihood of his committing crimes against United States interests. Certain crimes, particularly those involving violence against a person or against tangible property, are typically committed in close proximity to the person injured or property damaged. Therefore, Mr. Kikabidze would be unlikely to commit crimes of violence against persons or property located within the United States were he granted the permission to travel that he seeks. And were a reduction in Mr. Kikabidze's risk of committing such crimes the primary benefit expected from his present supervision, then granting his request might be justified on the grounds that removing him from the jurisdiction of the United States would be as effective—if not more effective—a method of protecting the public from his future crimes. However, Mr. Kikabidze's extensive criminal history, *see* Dkt. 14 ¶¶ 26-30, includes a number of crimes that may be committed without the perpetrator's being in close physical proximity to the victims, including bank and credit card fraud, *id.* ¶¶ 26, 30, trafficking in stolen goods, *id.* ¶¶ 27-28, and identity theft, *id.* ¶ 30. The Court has no reason to believe that relocating to Russia would prevent Mr. Kikabidze from victimizing Americans through these crimes, as he has done in the past—particularly given the inability of the Probation Office to meaningfully supervise him while residing in Russia.

Because the denial of Mr. Kikabidze's request to travel to Russia is necessary "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), it "is reasonably related to the factor[] set forth in section . . . [3553](a)(2)(C), and . . . involves no greater deprivation of liberty than is reasonably necessary for the purpose[] set forth in section [3553](a)(2)(C)," *id.* § 3583(d)(1)-(2).  Furthermore, 8 U.S.C. § 1481(a) merely sets forth the procedures by which Mr. Kikabidze might relinquish his citizenship, and does not grant him any enforceable legal interest in employing those procedures that disturbs this Court's discretion in evaluating his request for permission to travel.  Therefore, Mr. Kikabidze's request to modify the conditions of his supervised release imposed in No. 10 Cr. 339 and No. 20 Cr. 609 to allow his travel to Russia to relinquish his United States citizenship is denied.

The parties shall appear for a status conference on August 16, 2023, at 12:30 p.m., concerning Mr. Kikabidze's pending alleged violations of the conditions of his supervised release, for which he was arraigned on April 17, 2023.  The status conference will take place in Courtroom 12D of the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007.

SO ORDERED.

Dated: July 27, 2023
New York, New York

                          JOHN P. CRONAN
                       United States District Judge